SERCOMBE, S.J.
*175 Or Solar 7, LLC, (Or Solar) sought approval from Jackson County to establish an approximately 80-acre photovoltaic solar power generation facility on high-value farmland outside of, but adjacent to, the urban growth boundary (UGB) of the City of Medford. The county approved the application by ordinance.
1000 Friends of Oregon, (1000 Friends) appealed the county's decision to the Land Use Board of Appeals (LUBA), contending that the county had erred in approving the application. LUBA agreed, and reversed the county's decision. Or Solar seeks review and 1000 Friends cross-petitions for review of one of LUBA's conclusions set forth in its order. On review for whether the LUBA order is "unlawful in substance," ORS 197.850(9)(a), we affirm on Or Solar's petition for judicial review and reverse on 1000 Friends' cross-petition.
Because it is important to understanding the issues in this case, before turning to the parties' contentions on review, we first examine the regulatory context for the legal issues in dispute, as well as the determinations made by the county and LUBA. Statewide Planning Goal 3 (Agricultural Lands) requires counties to preserve and maintain agricultural lands for farm use, and to authorize "farm uses and those nonfarm uses defined by [Land Conservation and Development Commission (LCDC) ] rule that will not have significant adverse effects on accepted farm or forest practices." ORS 215.203(1) authorizes counties to designate agricultural land within an exclusive farm use (EFU) zone and limits the use of EFU-zoned land to farm use "except as otherwise provided in ORS 215.213, ORS 215.283 or ORS 215.203(1)." ORS 215.283(1) lists various nonfarm uses that counties must allow subject to state standards adopted by LCDC.[1]
*176 Greenfield v. Multnomah County , 259 Or.App. 687, 690, 317 P.3d 274 (2013). ORS 215.283(2) lists 2 nonfarm conditional uses which may be allowed if the county determines that they will not significantly affect surrounding lands devoted to farm or forest uses. See ORS 215.296(1) (setting out standards for approving ORS 215.283(2) conditional nonfarm uses); see also Greenfield , 259 Or.App. at 691 n. 2, 317 P.3d 274.
At the time of Or Solar's application, ORS 215.283 (2)(g) allowed "[c]ommercial utility facilities for the purpose of generating power for public use by sale" as a conditional nonfarm use in an EFU zone.[2] At that same *796 time, OAR 660-033-0130(38), part of an LCDC rule implementing Goal 3 and relating to standards for permitted and conditional nonfarm uses under ORS 215.283, allowed photovoltaic solar power generation facilities on high-value farmland provided, among other things, that the facility "shall not preclude more than 12 acres from use as a commercial agricultural enterprise unless an exception is taken pursuant to ORS 197.732 and OAR chapter 660, division 4" to the 12-acre limitation.
An "exception" is a variance to the requirements of a statewide planning goal.[3] Part II of Goal 2 (Land Use Planning) allows an exception, among other circumstances, when
"(c) The following standards are met:
"(1) Reasons justify why the state policy embodied in the applicable goals should not apply;
*177 "(2) Areas which do not require a new exception cannot reasonably accommodate the use;
"(3) The long-term environmental, economic, social and energy consequences resulting from the use of the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site; and
"(4) The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts."
See also ORS 197.732(2) (reiterating the Goal 2 exception standards). This is known as a "reasons exception." Under ORS 197.732(3)(b), LCDC is authorized to adopt rules establishing "[u]nder what circumstances particular reasons may or may not be used to justify an exception" under the "reasons exception" standards of Part II of Goal 2 and ORS 197.732(2). LCDC has adopted OAR 660-004-0022, which provides, in relevant part:
"(1) For uses not specifically provided for in this division, or in OAR 660-011-0060, 660-012-0070, 660-014-0030 or 660-014-0040, the reasons shall justify why the state policy embodied in the applicable goals should not apply. Such reasons include but are not limited to the following:
"(a) There is a demonstrated need for the proposed use or activity, based on one or more of the requirements of Goals 3 to 19; and either
"(A) A resource upon which the proposed use or activity is dependent can be reasonably obtained only at the proposed exception site and the use or activity requires a location near the resource. An exception based on this paragraph must include an analysis of the market area to be served by the proposed use or activity. That analysis must demonstrate that the proposed exception site is the only one within that market area at which the resource depended upon can reasonably be obtained; or
"(B) The proposed use or activity has special features or qualities that necessitate its location on or near the proposed exception site.
*178 "* * * * *
"(3) Rural Industrial Development: For the siting of industrial development on resource land outside an urban growth *797 boundary, appropriate reasons and facts may include, but are not limited to, the following:
"(a) The use is significantly dependent upon a unique resource located on agricultural or forest land. Examples of such resources and resource sites include geothermal wells, mineral or aggregate deposits, water reservoirs, natural features, or river or ocean ports;
"(b) The use cannot be located inside an urban growth boundary due to impacts that are hazardous or incompatible in densely populated areas; or
"(c) The use would have a significant comparative advantage due to its locations (e.g. , near existing industrial activity, an energy facility, or products available from other rural activities), which would benefit the county economy and cause only minimal loss of productive resource lands. Reasons for such a decision should include a discussion of the lost resource productivity and values in relation to the county's gain from the industrial use, and the specific transportation and resource advantages that support the decision."
Or Solar applied for a Goal 2 reasons exception to Goal 3 to allow an approximately 80-acre photovoltaic solar power generation facility-68 acres more than the 12-acre-sized facility conditionally allowed on high-value farmland. See OAR 660-033-0130(38). The Jackson County board of commissioners (board) approved the application and adopted Ordinance No. 2017-9 approving a " 'Reasons' Exception to Statewide Planning Goal 3." In that ordinance, the board explicitly found that the exception could be justified based on "two alternative reasons: (1) The 'demonstrated need'/locational necessity reason authorized under OAR 660-004-0022(1)(a) ; and (2) The 'rural industrial development' reason under OAR 660-004-0022(3)."
Specifically, with respect to OAR 660-004-0022 (1)(a), the board approved a Goal 13-related exception. The board determined that there was a demonstrated need for an approximately 80-acre facility based on the requirements of *179 Statewide Planning Goal 13 (Energy Conservation), which provides that its purpose is "[t]o conserve energy" and that "[l]and uses developed on the land shall be managed and controlled so as to maximize the conservation of all forms of energy, based upon sound economic principles." The board concluded that "Goal 13, State, and Federal energy policy establish a demonstrated need for the project consistent with OAR 660-004-0022(1)(a)." That conclusion rested on the following finding:
"Goal 13, in the context of the policies set forth in the State's energy policy, as well as federal and state statutes, establish a general requirement to utilize renewable resources, including the in-State siting of renewable energy production facilities such as the proposed project, and therefore establishes a 'demonstrated need' as required under OAR 660-004-0022(1)(a)."
With respect to OAR 660-004-0022(3)(c), the board concluded that the proposed facility was industrial development under OAR 660-004-0022(3) because the project met the definition of "industrial use" under Goal 9 (Economic Development), as "employment activities generating income from the production, handling or distribution of goods." OAR 660-009-0005(3). The board noted that the project would generate income from the sale of electricity. The board further concluded that, "[t]he proximity of Sage Substation [located inside the Medford UGB] provides a significant comparative advantage, would benefit the local economy, and as approved, does not involve a loss of resource lands" and adopted additional findings on that comparative advantage.
In its appeal to LUBA, 1000 Friends asserted that the county had erred in determining that (1) there was a demonstrated need for the project based on the requirements of Goal 13 under OAR 660-004-0022(1)(a) and that the project meets the locational requirements of OAR 660-004-0022(1)(a)(A) and (B); and (2) the proposed use meets the criteria for an exemption for rural industrial development and locational advantage under OAR 660-004-0022(3). In its brief before LUBA, Or Solar asserted that the demonstrated need requirement in OAR 660-004-0022(1)(a) for an oversized solar power generation facility was also satisfied by *180 the market demand for electricity created *798 under the power purchase agreement between Or Solar and PacifiCorp (the electrical utility providing service to the Medford area) and particular policies in the county comprehensive plan.
LUBA concluded that a reasons exception was not justified under OAR 660-004-0022(1)(a) based on the "requirements" of Goal 13:
"We disagree with the county and [Or Solar] that implicit in the Goal 13 requirement to 'conserve' energy is an affirmative obligation for counties to promote the development of renewable energy. While development of renewable energy is certainly consistent with the Goal 13 requirement to 'conserve' energy, the goal includes no express mandates regarding the development of renewable energy sources. The express requirement that '[l]and uses developed on the land shall be managed and controlled so as to maximize the conservation of all forms of energy' falls far short of including a requirement for cities and counties to promote the development of renewable energy. As the DLCD argues in its state agency brief, LCDC has defined the relevant terms 'conserve,' 'conservation' and 'develop' in ways that do not suggest that the Goal 13 requirement to 'maximize the conservation of all forms of energy' is intended to impose on local governments a requirement to promote the development of new energy sources in general, or renewable energy in particular."
(Brackets in LUBA's order.)
LUBA further determined that the proposed development was industrial in character for purposes of the OAR 660-004-0022(3) exception, relying, as did the county, on the definition of "industrial use," for the purpose of Goal 9, OAR 660-009-0005(3) ("[E]mployment activities generating income from the production, handling or distribution of goods."), as well as the ORS 197.722(1) definition of "industrial use" for the purpose of designating regionally significant industrial areas, as including "employment activities, * * * that generate income from the production, handling or distribution of goods or services." 1000 Friends argued that the one to three permanent maintenance jobs generated by the facility was insufficient to qualify the proposed facility as an employment activity. LUBA disagreed, holding that,
*181 "while the number of permanent jobs created may be a factor to be considered and balanced under the standards at OAR 660-004-0022(3)(c), we do not see that a use that otherwise appears to be an industrial use must be regarded as something else, simply because it will generate only a relatively small number of permanent jobs."
However, LUBA concluded that the county had failed to justify the locational advantage criterion in OAR 660-004-0022(3)(c) that "the use would have a significant comparative advantage due to its location." The county had concluded that the Sage Substation, located approximately 1.5 miles away in the City of Medford, was an energy facility that gave the oversized use a significant comparative advantage because the solar power generation facility "must be located near existing substations with available transmission capacity in order to be economically viable." LUBA reasoned, however, that locational attractor "near existing industrial activity, an energy facility or products available from other rural activities" described rural activities, so that the urban substation energy facility was not a sufficient locational attractor under OAR 660-004-0022(3)(c).
In its disposition of the appeal, LUBA reasoned:
" OAR 661-010-0071(1) provides that LUBA shall reverse a land use decision when the 'decision violates a provision of applicable law and is prohibited as a matter of law.' As discussed under the third assignment of error, the county misconstrued the applicable law with respect to the only two alternative reasons advanced to justify the proposed exception to Goal 3. Absent identification of a valid and sufficient reason under OAR 660-004-0022, the proposed reasons exception for a solar facility on the subject property is 'prohibited as a matter of law.' Accordingly, reversal is the appropriate disposition."
On review, Or Solar challenges LUBA's determinations under OAR 660-004-0022 and its disposition of reversal, instead of a remand.
*799 1000 Friends cross-petitions for review of LUBA's determination that the proposed facility was industrial development under OAR 660-004-0022(3)(c).
We begin with Or Solar's claim that LUBA erred in its determination that the ordinance could not be justified *182 on a reasons exception to Goal 3 based on OAR 660-004-0022(3)(c). As noted, under that rule, "[f]or the siting of industrial development on resource land outside an urban growth boundary, appropriate reasons and facts may include" that the use
"would have a significant comparative advantage due to its location (e.g. , near existing industrial activity, an energy facility, or products available from other rural activities), which would benefit the county economy and cause only minimal loss of productive resource lands. Reasons for such a decision should include a discussion of the lost resource productivity and values in relation to the county's gain from the industrial use, and the specific transportation and resource advantages that support the decision."
As discussed, LUBA construed paragraph (3)(c) to require the locational attractor to be on rural land outside of a UGB so that the location of the proposed facility close to the Sage Substation-on urban land inside the UGB-was insufficient. Specifically, LUBA reasoned that locational attractor "near existing industrial activity, an energy facility or products available from other rural activities" described rural activities because the phrase "other rural activities" denotes that the other uses described in the sentence are also types of "rural activities." If that were not the case, according to LUBA, the ending phrase would simply say, "products available from rural activities." LUBA also reasoned that the context of OAR 660-004-0022(3)(a) and (b), requiring that the industrial use be significantly dependent upon a unique resource that is located on agricultural or forest land or that it cannot be located inside an urban growth boundary,
"demonstrate a subsidiary concern that 'rural industrial development' potentially authorized under [ OAR 660-004-0022(3)(a) and (b) ] does not undermine the integrity and function of UGBs. As explained below, a broader reading of OAR 660-004-0022(3)(c), which would allow the requirement for a locational attractor to include a site or activity within a UGB, could easily result in development that undermines the function and integrity of that UGB."
LUBA noted that exceptions are exceptional and not the norm. LUBA explained that an interpretation of *183 OAR 660-004-0022(3)(c) that would allow the hypothetical siting of industrial uses near the clustering of industrial land near the periphery of an urban area because of the advantage of locating on less constrained and less expensive resource land was to be avoided. Thus, LUBA concluded that the Sage Substation was not a sufficient locational attractor under OAR 660-004-0022(3)(c).
On review, Or Solar argues that the text of the rule does not limit a locational advantage to proximity to a rural land use, that the parenthetical examples do not state the exclusive types of locational attractors, and that LUBA's concern about intensive industrial uses adjacent to UGBs are not relevant to an exception to Goal 3 to allow a conditional nonfarm use under ORS 215.283(2)(g). We agree with Or Solar.
We discern the intended meaning of an administrative rule by examining the text of the rule and its context (including other provisions of the same rule, other rules in pari materia with the rule in question, the statute authorizing the rule, and other related statutes), together with any relevant statement of agency intent in the rule adoption process or in the application of the rule by the authoring agency in other proceedings. Abu-Adas v. Employment Dep't Food Emplrs ., 325 Or. 480, 485, 940 P.2d 1219 (1997) ; see also State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009) ; PGE v. Bureau of Labor and Industries , 317 Or. 606, 611-12, 859 P.2d 1143 (1993) (describing rules of statutory construction); Landwatch Lane County v. LCDC , 290 Or.App. 694, 415 P.3d 1064 (2018) ; State v. Teixeira , 259 Or.App. 184, 190, 313 P.3d 351 (2013) (applying rules of construction to the interpretation of administrative rules).
*800 Applying those rules of construction here, the text of OAR 660-004-0022(3)(c) does not explicitly limit the reasons rationale for the siting of industrial development on rural land to a location near a rural resource. The list of the examples of the types of "comparative advantage due to [the rural industrial use] location" are just that-examples, not a description of the entire group of possible advantageous locales.
*184 1000 Friends relies upon the rule of ejusdem generis to argue that the examples of the types of comparative advantage describe the entire group of the possible examples. See Bellikka v. Green , 306 Or. 630, 636, 762 P.2d 997 (1988) ("[W]hen the legislature chooses to state both a general standard and a list of specifics, the specifics do more than place their particular subjects beyond dispute; they also refer the scope of the general standard to matters of the same kind, often phrased in Latin as 'ejusdem generis .' ").
The ejusdem generis rule generally applies when a specific list of items is followed by a "nonspecific term" at the end of the list. ZRZ Realty v. Beneficial Fire and Casualty Ins. , 349 Or. 117, 140, 241 P.3d 710 (2010). However, it does not generally apply when the list begins with the word "includes" or the phrase "including but not limited to." State v. Kurtz , 350 Or. 65, 75, 249 P.3d 1271 (2011) ("Typically, statutory terms such as 'including' and 'including but not limited to,' when they precede a list of statutory examples, convey an intent that an accompanying list of examples be read in a nonexclusive sense.").
That is the case here, both in the interpretation of the parenthetical itself and the rule as a whole. As matter of textual analysis, "an existing industrial activity" and an "energy facility" are not necessarily "rural activities," so that the reference to "other rural activities" in OAR 660-004-0022(3)(c) likely refers to rural activities other than the rural industrial activity being sited. The reference "e.g." (exempli gratia in Latin, meaning "for example") suggests that the agency intended the list to be nonexclusive.
Further, within the context of the other provisions of OAR 660-004-0022(3), paragraph (3)(a) explicitly links the rural industrial development to a "unique resource located on agricultural or forest land." The absence of that qualification to the locational attractors in paragraph (3)(c) suggests an intentional distinction between paragraphs (3)(a) and (3)(c) on linking the proposed rural industrial use to activities on rural land as opposed to activities on any type of land.
Finally, to whatever extent LUBA construed the exceptions rule as applied to Goal 3 to inhibit an urban *185 level of intensive uses adjacent to a UGB, that concern is addressed through an exception to Goal 14 (Urbanization), which directly inhibits urban development outside of an UGB. See 1000 Friends of Oregon v. LCDC (Curry County) , 301 Or. 447, 470-71, 724 P.2d 268 (1986) (land use decision that allows urban uses on rural land converts that land to urban use and must comply with Goal 14 or an exception to that goal). A Goal 14 exception is governed by different administrative rules, OAR 660-014-0040 (Establishment of New Urban Development on Undeveloped Rural Lands), and we see no reason to construe OAR 660-004-0022(3)(c) to inhibit urbanization by proscribing industrial uses adjacent to a UGB when that is not the purpose of the rule, but, instead is the purpose of an unrelated rule. We disagree, then, with LUBA's conclusion that OAR 660-004-0022(3)(c) requires the locational attractor to be on rural land outside of a UGB.
We do agree with LUBA that the county improperly justified the exception for a larger energy facility under OAR 660-004-0022(3)(c), but for a different reason. The proposed facility is not "industrial development" for the purpose of applying the OAR 660-004-0022(3)(c) exception to justify the variance to Goal 3, for three reasons.
First, the text of the rule itself distinguishes between "industrial activity" and an "energy facility," listing both types of land uses as part of a group of three examples of locational attractors. The county determined that an "energy facility" that employs persons in its construction, maintenance, or operation (as presumably all energy facilities do) is an "industrial activity." That construction of OAR 660-004-0022(3)(c) makes an "energy *801 facility" synonymous with an "industrial activity." As noted in Crystal Communications, Inc. v. Dept. of Rev. , 353 Or. 300, 311, 297 P.3d 1256 (2013), "[a]s a general rule, [courts] construe a statute in a manner that gives effect, if possible, to all its provisions." See also Blachana, LLC v. Bureau of Labor and Industries , 354 Or. 676, 692, 318 P.3d 735 (2014) ("[R]edundancy, of course, is a consequence that this court must avoid if possible."); ORS 174.010 ("[W]here there are several provisions or particulars [in a statute] such construction is, if possible, to be adopted as will give effect to all."). Under the avoidance of *186 surplusage principle, the text of OAR 660-004-0022(3)(c) suggests that an "energy facility" of the type in question is something different from an "industrial activity."
The overall context of relevant state and local laws also support that distinction in the rule. Under state and local law, distinctly different policies regulate the financing, siting, extent, and operation of industrial uses as opposed to those for energy or utility facilities.[4] For example, ORS 197.712(2)(c), Goal 9, and the rules implementing Goal 9 in OAR chapter 660, division 9 require cities to "provide for at least an adequate supply of sites of suitable sizes, types, locations and service levels for industrial and commercial uses consistent with plan policies."
By contrast, ORS 197.712(2)(e) requires cities and counties to develop a public facility plan for sewer and water utilities and transportation projects for urban areas containing a population of greater than 2,500 persons. Statewide Planning Goal 11 (Public Facilities and Services), requires that "[u]rban and rural development shall be guided and supported by types and levels of urban and rural public facilities and services appropriate for, but limited to, the needs and requirements of the urban, urbanizable, and rural areas to be served." The goal further defines "[u]rban [f]acilities and [s]ervices" to include "energy and communication services."
Goal 5 (Natural Resources, Scenic and Historic Areas, and Open Spaces), requires local governments to inventory, assess, and protect certain "significant" resources, including "energy sources." The goal guidelines specify that energy sources mean "sites for the generation of energy (i.e. natural gas, oil, coal, hydro, geothermal, uranium, solar and others)."
Finally, ORS 215.110(5) allows counties to include in their development codes "limitations designed to encourage and protect the installation and use of solar and wind energy *187 systems." ORS 227.190 empowers cities to adopt and implement solar access ordinances. See also ORS 227.290(2).[5]
Those general distinctions in the separate regulation of energy facilities and industrial land uses in LCDC rules and related state statutes reinforce the conclusion that, in OAR 660-004-0020(3)(c), LCDC intended a different meaning for rural industrial use and development as compared with energy facilities, including commercial utility facilities for the purpose of generating power for public use.
Second, the relevant context for purposes of the application of OAR 660-004-0022(3)(c) to justify a goal exception is the goal to which an exception is sought. The meaning of "industrial development" might vary for an exception to Goal 3, Goal 4 (Forest Lands), or other resource goals not otherwise subject *802 to specific exception rules. In any application of OAR 660-004-0022(3)(c) to permit industrial development otherwise not allowed by an applicable goal, the meaning of industrial development would exclude the uses allowed by the goal. Otherwise, there would be no need for an exception. Here, there is no need to except to Goal 3 to establish an industrial use if the use is otherwise allowed under Goal 3 and its implementing rules. As noted, ORS 197.732(1)(b) and OAR 660-004-0005(1) define "exception" for the purposes of the exception criteria as a comprehensive plan provision that, among other things, "[d]oes not comply with some or all goal requirements applicable to the subject properties or situations." Put another way, the exception process to an allowed or required use under a goal can only be used to justify a different use than the use allowed by the goal.
Goal 3 requires that "[a]gricultural lands shall be preserved and maintained for farm use" and defines "farm *188 use" as the uses "set forth in ORS 215.203." ORS 215.203(1) requires farmland to be used "exclusively for farm use except as otherwise provided" in ORS 215.283. And, as noted, ORS 215.283(2)(g) allowed the conditional establishment of the "nonfarm use" of "[c]ommercial utility facilities for the purpose of generating power for public use." Those use classifications for purposes of the allowed permitted and conditional uses in Goal 3 are the relevant classifications in determining whether other land uses (here, "industrial development") should be allowed as a variance or exception to Goal 3 under OAR 660-004-0022. Necessarily, for purposes of applying OAR 660-004-0022(3)(c) to except to Goal 3, a conditionally allowed commercial utility facility use is a different land use than an excepted industrial use. Thus, the proposed commercial utility facility is not, for purposes of applying OAR 660-0022(3)(c), an "industrial development."
The way that industrial uses are classified under other goals or rules is irrelevant to the application of OAR 660-004-0022(3) and the meaning of "industrial development" for purposes of a Goal 3 exception. The statewide planning goals and implementing administrative rules do not have an overarching definition of the term. The county in this case relied upon the definition of "industrial use" at OAR 660-009-0005(3), part of the rules adopted to implement Goal 9.[6] That rule defines "industrial use" "for purposes of this division"-that is, OAR chapter 660, division 9. That division, in turn, sets out rules for comprehensive plans within urban growth boundaries, OAR 660-009-0010(1), and Goal 9's requirement to "[p]rovide for at least an adequate supply of sites of suitable sizes, types, locations, and service levels for a variety of industrial and commercial uses consistent with plan policies." The meaning of "industrial land" for purposes of inventorying and preserving an *189 adequate supply of employment land in urban areas is categorically different from the meaning of needed rural industrial land for purposes of justifying an exception to the Goal 3 requirement to preserve agricultural land. Urban industrial land is defined by its employment generation potential and relationship to urban employment needs, whereas rural industrial land under OAR 660-004-0022(3)(c) is determined largely by its relationship to rural resource land and other resources.
Finally, as noted, OAR 660-004-0022(3) provides for the "siting of industrial development on resource land outside an urban growth boundary." "Site," as a transitive verb, means "to provide with a site : LOCATE ." Webster's Third New Int'l Dictionary 2128 (unabridged ed. 2002) (boldface in original). Or Solar sought to "site" a "commercial utility facility for the purpose of generating power for public use" as a conditional nonfarm use under ORS 215.283(2)(g). The commercial *803 utility facilities allowed under that statute and its implementing rule at the time of Or Solar's application could be up to 320 acres without an exception, depending upon the soil classification of the underlying EFU land. OAR 660-033-0130(38). Without regard to the acreage standard for the commercial utility facility itself, the EFU use in question, for purposes of the application of OAR 660-004-0022(3)(c), is a "commercial utility facility for the purpose of generating power for public use."
The county exception proceeding under OAR 660-004-0022(3)(c) was not one to locate, provide for, or establish a site. Instead, it was to vary a facility site characteristic, to allow a commercial utility facility that covers approximately 80 acres of land instead of a commercial utility facility on 12 of those acres. A Goal 9 rule defines "site characteristics" for purposes of inventorying and demarcating a sufficient supply of urban employment land as
"the attributes of a site necessary for a particular industrial or other employment use to operate. Site characteristics include, but are not limited to, a minimum acreage or site configuration including shape and topography, visibility, specific types or levels of public facilities, services or energy infrastructure, or proximity to a particular transportation *190 or freight facility such as rail, marine ports and airports, multimodal freight or transshipment facilities, and major transportation routes."
OAR 660-009-0005(11). Because the proceeding was not one to "site" a proposed use, but, instead, was one to vary a site characteristic, ORS 660-004-0022(3)(c) did not apply.
In sum, LUBA erred in concluding that the proposed commercial utility facility use was a "industrial development" under OAR 660-004-0022(3)(c) in light of the textual differences in the rule between "energy facility" and "industrial activity" and the necessary differences between a commercial utility facility and industrial development in the context of the application of an OAR 660-004-0022 (3)(c) to except to the uses allowed by Goal 3. Relatedly, the exception was not viable because the proceeding under that part of the rule was not one for the "siting" of industrial development, but instead was one for the varying of a site characteristic required by Goal 3.
As noted, Or Solar also challenges LUBA's determination that a reasons exception was not appropriate under to OAR 660-004-0022(1)(a). As also noted, that rule provides:
"(1) For uses not specifically provided for in this division, or in OAR 660-011-0060, 660-012-0070, 660-014-0030 or 660-014-0040, the reasons shall justify why the state policy embodied in the applicable goals should not apply. Such reasons include but are not limited to the following:
"(a) There is a demonstrated need for the proposed use or activity, based on one or more of the requirements of Goals 3 to 19; and either [locational factors are satisfied]."
As discussed, the county concluded that the need for a larger photovoltaic solar power generation facility was based on the requirement of Goal 13 to "conserve energy." LUBA disagreed that Goal 13 required the development of photovoltaic facilities of any particular size.
On review, Or Solar contends that Goal 13 requires that "[l]and and uses developed on the land shall be managed and controlled so as to maximize the conservation of all forms of energy, based upon sound economic principles." The statewide planning goals define "conserve" as "[t]o manage *191 in a manner which avoids wasteful or destructive uses and provides for future availability." "Development" is defined to be "[t]he act, process or result of developing." From those definitions, and the text of Goal 13, Or Solar concludes that "it can be reasonably inferred that LCDC intended the scope of Goal 13's energy conservation mandate to include the development of renewable energy."
Or Solar also relies on inferences from the Goal 13 guidelines to buttress that conclusion. Under ORS 197.015(9), "guidelines" mean "suggested approaches designed to aid cities and counties in preparation, adoption and implementation of comprehensive plans in compliance with the goals * * *. Guidelines shall be advisory and shall not limit state *804 agencies, cities, counties and special districts to a single approach." The "planning" guidelines appended by LCDC to the text of Goal 13 provide for particular plan and implementing measures to allocate land and regulate uses on land to "assure achievement of maximum efficiency in energy utilization," "minimize the depletion of non-renewable sources of energy," "recycle and re-use vacant land and those uses which are not energy efficient," and to
"consider as a major determinant the existing and potential capacity of the renewable energy sources to yield useful energy output. Renewable energy sources include water, sunshine, wind, geothermal heat and municipal, forest and farm waste. Whenever possible, land conservation and development actions provided for under such plans should utilize renewable energy sources."
Or Solar asserts that "potential" renewable energy sources "(which includes solar energy) can only be interpreted to mean that the scope of Goal 13's mandate to conserve energy includes the development of renewable energy sources."[7]
*192 We agree with LUBA's conclusion that Goal 13 does not require counties to develop or facilitate the development of energy facilities. Some of the goals do require the designation and development of land for various uses.[8] Most of the goals pertain to the conservation of land for resource, scenic, historical, and recreational uses.[9] Goals 1 and 2 pertain to the process for adopting plans and implementing measures.
The remaining goals regulate the manner by which land is developed. Goal 6 (Air, Water and Land Resources Quality), requires planning entities "to maintain and improve the quality of the air, water and land resources of the state." Goal 7 (Areas Subject to Natural Hazards), require localities to "protect people and property from natural hazards" by regulating, among other things, "the types and intensities of uses to be allowed in the hazard area."
Goal 13 falls within this category of policies affecting the manner by which property is developed. The goal expressly states that it regulates the way land uses are "managed and controlled." The planning and implementation guidelines for the goal pertain to "land use planning" and "techniques and implementation devices" in a comprehensive plan and map and its implementing development code and zoning map. Neither the text of the goal nor its guidelines "require" the county to develop or facilitate the development of any particular land use, much less large solar power generation facilities.[10] Instead, Goal 13 *805 requires *193 that all development on land be "managed and controlled" to conserve energy. The text of the goal and its guidelines do not directly or indirectly require the development of energy facilities.
Furthermore, even putting aside the necessity to base a reasons exception under OAR 660-004-0022(1)(a) on a goal requirement, and even if the goal inferentially supported the general development of renewable energy facilities, Goal 13 would nonetheless be immaterial to Or Solar's application for an exception. As noted earlier, the requested exception was not for the development of an energy facility. A "[c]ommercial utility facilit[y] for the purpose of generating power for public use" was allowed on the site by ORS 215.283(2)(g) and OAR 660-033-0130(38). Or Solar's exception request was to the requirement in Goal 3 that authorizes counties to approve "farm uses and those nonfarm farm uses defined by [LCDC] rule" and to the requirement in OAR 660-033-0130(38) that the facility be not more than 12 acres in size when located on high-value farmland. Thus, the exception was to justify an energy facility of a particular size, and Goal 13 has no bearing on that justification.
We turn, finally, to Or Solar's assertion that LUBA improperly interpreted its own rule, OAR 661-010-0071, in reversing, rather than remanding, the county's land use decision. ORS 197.835(1) requires LUBA to "adopt rules defining the circumstances in which it will reverse rather *194 than remand and land use decision * * * that is not affirmed." Accordingly, LUBA adopted OAR 661-010-0071(1)(c), which provides that the board "shall reverse a land use decision when * * * [t]he decision violates a provision of applicable law and is prohibited as a matter of law." OAR 661-010-0071(2)(d) further provides that the board "shall remand a land use decision for further proceedings when * * * [t]he decision improperly construes the applicable law, but is not prohibited as a matter of law."
As noted, LUBA concluded that the requested land use decision was "prohibited as a matter of law" because "the county misconstrued the applicable law with respect to the only two alternative reasons advanced to justify the proposed exception to Goal 3. Absent identification of a valid and sufficient reason under OAR 660-004-0022, the proposed reasons exemption * * * is 'prohibited as a matter of law.' " On review, Or Solar argues that LUBA improperly interpreted the meaning of "prohibited as a matter of law" to mean prohibited under the exception actually sought from the county. Or Solar contends that an exception could be obtained under the general reasons exception criteria in OAR 660-004-0022(1) because the "rule plainly contemplates that there may be other appropriate reasons, not listed in the rule, for justifying an exception to Goal 3 for the Project." Or Solar surmises that the demonstrated need for a reasons exception could be shown by various statutes related to energy needs, and, therefore, such an exception is not "prohibited as a matter of law."[11]
*806 *195 Or Solar's focus is on the wrong part of the rule. The issue is whether the decision is prohibited as a matter of law. LUBA construed the meaning of "decision" in its rule to mean the land use decision under review, the one applied for and approved by the county. Whether a different decision or application would allow a different result is beside the point.
We ordinarily defer to an agency's construction of its own rules. Don't Waste Oregon Com. v. Energy Facility Siting , 320 Or. 132, 142, 881 P.2d 119 (1994) (reviewing courts will give deference to an agency's plausible interpretation of its own rule when that interpretation is consistent with the wording of the text, in context, and with other sources of applicable law). Here, LUBA reasonably construed "land use decision" in its administrative rule to mean the land use decision that was requested by Or Solar and issued by the county-a Goal 3 exception under the specific provisions of OAR 660-004-0022(1)(a) (requirements of Goal 13) and OAR 660-004-0022(3)(c) (rural industrial development exception). Or Solar offers no textual or contextual analysis to suggest a different meaning.
We reverse that portion of the LUBA order that concluded that the requested facility was rural industrial development under OAR 660-004-0022(3)(c) and affirm the remainder of the order, including LUBA's disposition.
Affirmed on petition; reversed in part on cross-petition.

Some of the permitted nonfarm utility uses under ORS 215.283(1) include "[u]tility facilities necessary for public service * * * but not including commercial facilities for the purpose of generating electrical power for public use by sale," ORS 215.283(1)(c), "[o]perations for the * * * production of geothermal resources * * * and oil and gas," ORS 215.283(1)(f), and "[u]tility facility service lines," ORS 215.283(1)(u).

In 2017, the legislature amended ORS 215.283(2)(g) to add the following: "If the area zoned for exclusive farm use is high-value farmland, a photovoltaic solar power generation facility may be established as a commercial utility facility as provided in section 2 of this 2017 Act." Or. Laws 2017, ch. 504, § 5. Section 2 of that act, codified at ORS 215.447, allows photovoltaic solar power generation facilities on high-value farmland if certain requirements are met, including that the facility "[d]oes not exceed the acreage the electric utility reasonably anticipates to be necessary to achieve the applicable renewable portfolio standard described in ORS 469A.052(3)." ORS 215.477(2)(d). When evaluating an application for a photovoltaic solar power generation facility on high-value farmland, a "county is not required to adopt an exception under ORS 197.732 to a statewide land use planning goal relating to agricultural land to authorize the establishment of a photovoltaic solar power generation facility under this section." ORS 215.447(4).

ORS 197.732(1)(b) defines an "exception" as a "comprehensive plan provision * * * that * * * [i]s applicable to specific properties or situations," that "[d]oes not comply with some or all goal requirements applicable to the subject properties or situations," and that complies with the exception standards in ORS 197.732(2).

As noted, ORS 215.283(1)(c) classifies "commercial facilities for the purpose of generating electrical power for public use by sale" as "[u]tility facilities necessary for public service," but excludes those commercial facilities from the permitted nonfarm use for utility facilities that are otherwise allowed by ORS 215.283(1)(c).

Otherwise, the siting and regulation of energy facilities is largely a matter of federal and state law. ORS 469.010(2) declares a need for "comprehensive state leadership in energy production, distribution and utilization." ORS 469.300 to ORS 469.619 regulates energy facilities, defined to include a "solar photovoltaic power generation facility" using more than 100 acres if located on high-value or Class I to IV agricultural land, or 320 acres on any other land. ORS 469.300 (11)(a)(D). An energy facility site certificate can be obtained from the Energy Facility Siting Council (EFSC) if it either complies with local planning laws as determined by the planning jurisdiction or by EFSC, or, as solely determined by EFSC, if the project complies with the statewide planning goals under modified exception criteria or with substantive criteria developed by an advisory group.

As defined by OAR 660-009-0005(3), "industrial use" means
"employment activities generating income from the production, handling or distribution of goods. Industrial uses include, but are not limited to: manufacturing; assembly; fabrication; processing; storage; logistics; warehousing; importation; distribution and transshipment; and research and development. Industrial uses may have unique land, infrastructure, energy, and transportation requirements. Industrial uses may have external impacts on surrounding uses and may cluster in traditional or new industrial areas where they are segregated from other non-industrial activities."

Or Solar also argues that various provisions of the Jackson County comprehensive plan, adopted after the promulgation of Goal 13 in 1975, are relevant to the meaning of Goal 13 because the plan has been acknowledged as complying with Goal 13. Of course, later-enacted local interpretations of Goal 13 are not relevant to LCDC's original intended meaning of Goal 13. See OR-OSHA v. CBI Services, Inc. , 356 Or. 577, 593, 341 P.3d 701 (2014) ("Court decisions that existed at the time that the legislature enacted a statute-that, as a result, it could have been aware of-may be consulted in determining what the legislature intended in enacting the law as part of the context for the legislature's decision. * * * Case law published after enactment-of which the legislature could not have been aware-is another matter."); see also Gaines , 346 Or. at 177 n. 16, 206 P.3d 1042 ("Ordinarily, only statutes enacted simultaneously with or before a statute at issue are pertinent context for interpreting that statute."). For the same reason, the county's construction and application of Goal 13 "in the context of the policies set forth in the State's [later-enacted] energy policy" is not apt.

Goals 9 (Economic Development), 10 (Housing), 11 (Public Facilities and Services), 12 (Transportation), and 14 (Urbanization) require the designation and development of land for various industrial, commercial, residential, public facility, transportation, and urban uses.

See Goals 3 (Agricultural Lands), 4 (Forest Lands), 5 (Natural Resources, Scenic and Historic Areas, and Open Spaces), 8 (Recreational Needs), 15 (Willamette River Greenway), 16 (Estuarine Resources), 17 (Coastal Shorelands), 18 (Beaches and Dunes), and 19 (Ocean Resources).

Goals 13 and 18 are the only goals that lack implementing LCDC rules. We cannot rely on LCDC rules to refine the meaning of Goal 13. As explained in Edward J. Sullivan, The Slow Evolution of Energy Planning-One State's Experience , 40 Zoning and Planning Law Report, Issue 3 (2017),
"However, in the case of Goal 13 unlike most other goals, there are no LCDC adopted rules to implement the goal or detail its obligations. Indeed, Goal 13 was adopted before a state energy policy was later formulated in 1975 and has never referred to that policy.
"The reason for this unusual state of affairs may lay in the Arab Oil Embargo, which began in the fall of 1973, just as the Goals were being formulated and resulted in long gas station wait times. LCDC apparently believed that energy was important, but it was not clear just what steps should be taken. While the goal itself reflected that importance, it was accompanied by guideline language, full of 'shoulds.' When the crisis waned in early 1975, LCDC focused on other contentious issues and has never revised the Goal. In its review of the land use plans and regulations of approximately 300 local governments to determine whether they should be 'acknowledged' or certified as meeting the statewide planning goals, there was not a single significant contest over the Energy Goal."
(Footnotes omitted.)

It is clear that Or Solar's requested exception to Goal 3 under OAR 660-004-0022(1)(a) was based entirely on the requirements of Goal 13, and not on the other policies cited by Or Solar on review. Or Solar's application and presentations to the planning commission and board of county commissioners asserted that the exception to Goal 3 was based on OAR 660-004-0022(1)(a) and the requirements of Goal 13. The application for the exception and limited use overlay zone stated the bases for the requested reasons exception-that "the proposal advances several policies within Goals 3 to 19, most notably Goal 13, which is most explicit in support of these renewable energy projects," and that "it is likely that OAR 660-004-0022(l)(a)(B) is most applicable; however, the reasons can be justified under that subsection or OAR 660-004-0022(3)(c)." Before the county board of commissioners, Or Solar represented that the Goal 3 exception "can be justified under two alternative reasons: (1) the 'demonstrated need'/locational necessity reason authorized under OAR 660-004-0022(l)(a) ; and (2) the 'rural industrial development' reason under OAR 660-004-0022(3)." Or Solar further claimed that "Goal 13's requirement to utilize renewable resources, including solar, 'whenever possible' is a proper basis upon which to consider siting such facilities under a Goal 2 exception." 1000 Friends disagreed "that Goal 13 creates a demonstrated need for the proposed use." Or Solar countered that "[i]t is not the intent of applicant to assert that Goal 13 creates a de facto priority over agricultural lands, only that it can justify why the policies in Goal 3 should not apply."